IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| CLEVELAND HILL, JR., <br><br> Plaintiff, <br><br> v. <br><br> JOHN FOSTER HOMES, INC. and CMH MANUFACTURING, INC., <br><br> Defendants. | Action No. 3:10-CV-209 |

## MEMORANDUM OPINION

This matter is before the Court on Motions to Dismiss filed by Defendant CMH Manufacturing, Inc. (Dock. No. 6) and Defendant John Foster Homes, Inc. (Dock. No. 8). For the reasons that follow, the Court GRANTS the Motions.

## I. BACKGROUND

This controversy arises out of Plaintiff Cleveland Hill, Jr.'s purchase from Defendant John Foster Homes, Inc. ("JFH") of a mobile home made by Defendant CMH Manufacturing, Inc. On April 21, 2008, in connection with that purchase, Hill signed a contract stating that the total cash purchase price for a 2008 Gatson Manor model was $47,915. (JFH Memo., Ex. A.) The contract also indicates that Hill paid a down payment of $20,000, leaving a balance of $27,915. On the left column of the first page of the contract, the following appears:

| OPTIONAL EQUIPMENT, LABOR & ACCESSORIES | |
|---|---|
| PRICE TO INCLUDE MANUFACTURER SITE DROPING OF THE HOME TO CUSTOMERS PROPERTY IN APPOMATTOX COUNTY, V.A. | |
| PRICE DOES NOT INCLUDE SET-UP | |
| CUSTOMER IS TO PAY A DRAW IN THE AMOUNT OF $22,915.00 THE DAY THE HOME IS SET. THE REMAINING BALANCE OF $5,000.00 IS TO BE PAID ONCE WORK IS COMPLETE AND CUSTOMER HAS DONE WALK THROUGH OF HOME. | |
| CUSTOMER'S INITIALS _[signature]_ | |

Other provisions include one stating in all capital letters that "This Agreement contains the entire understanding between dealer and buyer and no other representations or inducement, verbal or written had [sic] been made which is not covered in the contract." By signing the contract, the parties also agreed to binding arbitration for "any controversy or claim" arising out of the agreement. The parties further consented to a provision establishing that suits regarding the agreement must be brought in a North Carolina court and interpreted under North Carolina law.

In his Amended Complaint, Hill alleges that at the time he and JFH's agent signed this contract, other material representations were made to Hill. Paragraph 17 of the Amended Complaint states:

> Foster's salesperson also made the following representations prior to Hill executing the contract of sale and which agreements and promises induced Hill to execute the contract:
> a. [sic] that the manufactured home would be delivered to property of Hill's choice in Appomattox County, Virginia;
> b) that for the total price set forth in the contract, the manufactured home would be installed on a foundation which Hill was responsible to have constructed;
> c) that included in the sales price would be the installation of all of the interior and exterior parts which came with the home, including but not limited to exterior roofing and siding; connecting the two halves of the manufactured home after it was delivered on site and put on the foundation;

2

installing the flooring, kitchen cabinets, rugs, and other items that were furnished with the home.

(Am. Compl. ¶ 17.) Hill claims that "neither Foster nor Hill intended for [the provision stating that the "Price does not include set-up"] to be applicable to the sale." (Am. Compl. ¶ 20.)

When Hill's home was delivered to his property in Appomattox County, it arrived in two separate halves which were taken from the trucks and placed on the ground. Hill states that JFH provided no additional work on the home beyond the delivery. Despite several attempts to resolve the issue with JFH, Hill eventually had to pay a third party to install the two halves on the foundation and complete the work on the exterior and interior of the home. Hill claims that the price paid for the installation exceeded the remaining balance he owed JFH.

One day John M. Foster, JFH's namesake and president, appeared at Hill's home to request the $27,915 balance Foster asserted Hill owed on the contract. Hill says he tried to explain the difficulties he had encountered due to the extra money he had to expend to pay for the installation and stated that he would be willing to pay Foster $5,000 to settle the dispute. In response to the offer, Hill, an African-American, asserts that Foster became enraged, beginning his comments with "Look you Black nigger." (Am. Compl. ¶ 33.) Hill thereafter told Foster to immediately leave his property.

In the summer of 2008, Hill and his wife moved in to the home, however, he immediately began suffering from a number of health problems, including irritated breathing, which necessitated a number of trips to his physician to determine the cause of his maladies. Making a connection between his health problems and his recent move to the mobile home, Hill decided to have the home checked for formaldehyde contamination. A

company called Indoor Analytics collected air samples from each of the rooms in the home, finding a level of .032 parts per million ("ppm") of formaldehyde in the air collected in the master bedroom, which according to the company was "at a level of concern for a residential environment." (Am. Compl. ¶¶ 41, 43, 46.)

With the contract dispute between Hill and JFH still unresolved, JFH, in October of 2008, filed a complaint in the Circuit Court of Appomattox County asserting breach of contract and seeking to enforce a previously filed mechanic's lien. The Circuit Court declined to rule on JFH's motion for summary judgment because, Hill states, arbitration between the parties was ongoing. (Am. Compl. ¶¶ 65-66.)

In March of 2010, Hill filed his Complaint in this case, which he then amended in April. His Amended Complaint asserts four counts against JFH: (1) violation of 42 U.S.C. §§ 1981, 1982; (2) violation of Virginia's Manufactured Housing Code; (3) malicious prosecution; and (4) negligence. Hill also asserted Counts I, II, and IV against CMH. Both Defendants have now filed Motions to Dismiss.

## II. LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires a complaint stating a claim for relief to contain a short plain statement of the claim that gives the defendant fair notice of what the claim is and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Defendants police this requirement using Rule 12(b)(6), which permits a party to test the legal sufficiency of a complaint. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). A 12(b)(6) motion does not, however, "resolve contests surrounding the facts, the merits of a claim, or the

4

applicability of defenses." Id. As a result, in resolving a 12(b)(6) motion, a court must regard all of plaintiff's well-pleaded allegations as true, Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), as well as any facts that could be proved consistent with those allegations, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In contrast, the court does not have to accept legal conclusions couched as factual allegations, Twombly, 550 U.S. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments," E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). With these principles in mind, the court must ultimately ascertain whether the plaintiff has stated a "plausible, not merely speculative, claim for relief." Twombly, 550 U.S. at 555.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950. While Rule 8(a)(2) requires a showing, not simply a blanket assertion of "entitlement to relief," the plaintiff is not required to show that it is likely to obtain relief. Twombly, 550 U.S. at 556 n.3; Iqbal, 129 S. Ct. at 1949. In the end, if the complaint alleges—directly or indirectly—each of the elements of "some viable legal theory," the plaintiff should be given the opportunity to prove that claim. Twombly, 550 U.S. at 563 n.8.

A district court may consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Sec'y of State of Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

### III. DISCUSSION

In his Amended Complaint, Hill asserts four claims against JFH, three of which he

5

also asserts against CMH. In response to CMH's current motion, however, Hill concedes that two of the counts—Counts I and II—asserted against CMH should be dismissed as to CMH. As a result, the negligence claim in Count IV is the only claim still asserted against both defendants. Each allegation is discussed below.

## A. Violation of 42 U.S.C. §§ 1981, 1982 (Count I)

In Count I of the Amended Complaint, Hill asserts that JFH violated the rights protected by 42 U.S.C. §§ 1981 and 1982. Section 1981, in relevant part, grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1982 likewise prohibits race discrimination in the purchase and sale of goods by providing that "[a]ll citizens . . . shall have the same right, . . . as is enjoyed by white citizens to inherit, purchase, lease, sell, hold, and convey real and personal property." Id. § 1982. Courts consistently construe these two statutes together. See Saunders v. Gen. Servs. Corp., 659 F. Supp. 1042, 1063 (E.D. Va. 1987).

To succeed on a claim under either § 1981 or 1982, a plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest or legitimate property right. See Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006); Mobley v. Rossell, 297 F. Supp. 2d 835, 840 (D. Md. 2003). Thus, although Hill has certainly pled sufficient direct evidence of a racial discrimination, the issue here is whether he has sufficiently pled that JFH interfered with a legitimate contract or property right.

To decide whether Hill had a contractual right to have his home installed, the Court must look to the contract between the parties as well as the allegations made in the

Amended Complaint.[1] The contract states on its face that "price does not include set-up," however, Hill maintains that JFH's employee told him at the time the contract was made that the price in fact did include set-up. This issue implicates the parole evidence rule.

Under North Carolina law, which the parties contractually agreed to apply, the parole evidence rule provides that "where the writing is a total integration, that is, where the writing integrates all the terms of the contract and supercedes all other agreements relating to the transaction ... evidence of prior and contemporaneous negotiations and agreements are not admissible to vary, add to, or contradict the writing." Smith v. Cent. Soya of Athens, Inc., 604 F. Supp. 518, 524 (E.D.N.C. 1985) (citing Rowe v. Rowe, 305 N.C. 177, 185 (N.C. 1982); Craig v. Kessing, 253 S.E.2d 264 (N.C. 1979)).

If, however, the writing is only a "partial integration," that is, where the "writing was not intended to be a complete and exclusive statement of all the terms of the agreement, then ... evidence of consistent additional terms may also be introduced and incorporated into the writing by means of parol evidence." Id. at 524 (citations omitted).

To ascertain whether integration is total or partial, North Carolina courts look to whether "the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty." Id. at 525. In such cases, "it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing." Id. (quoting Neal v. Marrone, 79 S.E.2d 239, 241 (N.C. 1953)). "This approach reflects the view that situations will often arise in which the writing, on its face, clearly embodies the sum total of the parties' agreement. In these instances, further

---

[1] Hill referenced the contract in his Amended Complaint and thus it can be considered by the Court without transforming the instant motions into motions for summary judgment. See Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

7

inquiry beyond the terms of the contract is not required." Id. "By the same token, when the terms of the writing are not so definitive, then implicitly, the court must view the surrounding circumstances to ascertain the intent of the parties with regard to whether the writing was meant to be a total integration." Id.

"The existence of a merger clause generally provides unambiguous and unassailable evidence of the parties' intent with reference to the terms of the contract." Id. at 526. It "creates a rebuttable presumption that the writing is a complete and exclusive statement of the contract terms." Id. "In order to rebut the presumption and, in effect, invalidate the merger clause, a party must offer evidence to establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact." Id.

In this case, the parties signed a contract with a special provision added providing that the contract price did not include set-up. Hill initialed his name beside this provision. Moreover, the contract is fully integrated due to the presence of the merger clause, which creates a rebuttable presumption that the contract is the exclusive statement of the parties' agreement. Hill may rebut this presumption only by sufficiently alleging the existence of fraud, unconscionability, negligent omission, mistake in fact, or mental incapacity. See id. He has not, however, addressed any of these issues in his Amended Complaint or in his response to the Defendants' briefs. As a result, he cannot escape the terms stated on the face of the contract, one of which provides that the price does not include set-up. Therefore, although Hill has evidence that he encountered detestable racial animosity, he has not shown that he was deprived of any legitimate contract or property right flowing from that animosity. Without such a showing, his 1981 and 1982 claim cannot go forward.

**B. Violation of Virginia's Manufactured Housing Code, Va. Code. § 36-85.23 (Count II)**

8

In Count II, Hill alleges "Defendants violated the Virginia Manufactured Housing Code when they failed and refused to set up the manufactured home purchased by Hill for delivery in Virginia and simply left the two halves on Hill's property." (Am. Compl. ¶ 59.)

The Virginia Manufactured Housing Code provides the scope and content of the warranties that accompany the sale of a manufactured home: "[e]ach manufacturer, dealer, and supplier of manufactured homes shall warrant each new manufactured home sold in this Commonwealth, and the dealer shall warrant the set-up of each manufactured home <u>if performed by or contracted for by the dealer</u> . . . ." Va. Code § 36-85.23 (emphasis added). By the statute's plain language, dealers, such as JFH, are not required to set-up each manufactured home that it sells. Instead, only if it performs the set-up or contracts for it to be done, do the warranties listed in § 36-85.23(2) become applicable. Here, because Hill cannot contradict the contract with parole evidence to show that JFH agreed to set-up Hill's home, this claim must be dismissed because the warranties provided by Virginia law are not applicable on these facts.

### C. Malicious Prosecution (Count III)

Hill asserts, in Count III, a malicious prosecution claim against JFH following JFH's suit brought in Virginia state court against Hill to enforce a mechanic's lien. Hill claims the suit was motivated by racial animus and was frivolous because JFH knew the contract required arbitration and because JFH knew or should have known that by failing to set-up Hill's home, it was not entitled to recover the balance of the contract price. Hill contends that although the suit was not dismissed, the court's decision to withhold on a ruling was tantamount to termination in his favor.

Before evaluating whether Hill has pled sufficient facts to state a claim for malicious

prosecution, the Court must first decide whether, as JFH suggests, the claim is subject to the arbitration clause in the parties' contract. The arbitration provision states that the parties agreed that "any controversy or claim between dealer and buyer arising out of or relating to this contract, or breach thereof, shall be settled exclusively by arbitration." (JFH Memo., Ex. A.) Hill's malicious prosecution claim comfortably fits within that capacious clause in that it arises out of the mobile home transaction between Hill and JFH and the suit JFH brought against Hill, which also arose out of Hill's purchase.

Hill maintains, however, that JFH cannot enforce the arbitration clause because JFH already breached the contract by itself filing suit in violation of the arbitration clause. (Hill Memo. 5 (citing Centex Constr. v. Acstar Ins. Co., 448 F. Supp. 2d 697, 714 (E.D. Va. 2006)). Thus, the question becomes whether filing suit in violation of the arbitration clause in the parties' contract is considered a breach of that contract which allegedly thereby excuses the non-breaching party from that same provision. To decide that issue the Court must apply North Carolina law due to the provision in the parties' contract stating that "[t]he law of the State of North Carolina is the law, which is to be used in interpreting the terms of the contract." (JFH Memo., Ex. A, ¶14.)

North Carolina has a strong public policy favoring arbitration. See Cyclone Roofing Co. v. David M. La Fave Co., 321 S.E.2d 872, 876 (N.C. 1984). However, the North Carolina Supreme Court has held that a party may expressly or impliedly waive its contractual right to arbitration. Id. "Waiver of a contractual right to arbitration is a question of fact. [However] [b]ecause of the strong public policy in North Carolina favoring arbitration, courts must closely scrutinize any allegation of waiver of such a favored right." Id. Based on those pronouncements, one North Carolina Court of Appeals held that a defendant did

10

not waive its contractual right to arbitration in connection with a suit filed against it in North Carolina even though the defendant had filed suit against the plaintiff in Florida. N.C. Farm Bureau Mut. Ins. Co. v. Sematoski, 672 S.E.2d 90, 93 (N.C. App. Ct. 2009). As the court stated, "'[t]he mere filing of . . . pleadings did not manifest waiver . . . of [the] right to arbitrate under the contract.'" Id. (quoting Cyclone Roofing Co., 321 S.E.2d at 877). Without any other evidence or assertions on the part of Hill to support waiver, the Court concludes that the arbitration provision in the contract is valid and enforceable. Hill's malicious prosecution claim arises out of the contract with JFH and therefore must go to the arbitrator. Moreover, even if JFH's Virginia suit was considered a waiver of the arbitration provision in the parties' contract, that suit has not ended in Hill's favor and therefore cannot be the basis for a malicious prosecution claim. As a result, Hill's malicious prosecution claim is DISMISSED.

### D. Negligence (Count IV)

In the Motions to Dismiss filed by JFH, the seller of Hill's mobile home, and CMH, the manufacturer of Hill's mobile home, the Defendants note that the construction of this home is governed and regulated by the Manufactured Home Construction and Safety Standards Act, 42 U.S.C. §§ 5401-5426. Pursuant to that law and the associated regulations, the Defendants assert that Hill's negligence claim is preempted in accordance with the Supremacy Clause of Article VI, Section 2 of the United States Constitution. Hill maintains that his negligence claim is not preempted. Resolution of this issue requires an understanding of the MHA and its regulations as well as the law of preemption.

#### 1. The MHA's Statutory and Regulatory Framework

The MHA explicitly states its purpose is:

(1) to protect the quality, durability, safety, and affordability of manufactured homes
(2) to facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans;
(3) to provide for the establishment of practical, uniform, and, to the extent possible, performance-based Federal construction standards for manufactured homes;
(4) to encourage innovative and cost-effective construction techniques for manufactured homes;
(5) to protect residents of manufactured homes with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing, consistent with the other purposes of this section;
(6) to establish a balanced consensus process for the development, revision, and interpretation of Federal construction and safety standards for manufactured homes and related regulations for the enforcement of such standards;
(7) to ensure uniform and effective enforcement of Federal construction and safety standards for manufactured homes; and
(8) to ensure that the public interest in, and need for, affordable manufactured housing is duly considered in all determinations relating to the Federal standards and their enforcement.

42 U.S.C. § 5401(b). To accomplish these goals, the MHA grants the Secretary of HUD authority to establish appropriate federal construction and safety standards for manufactured homes. Id. § 5403(a).

> The MHA's preemption provision states that
>
> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding the construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

Id. § 5403(d). This provision further states:

> Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter. Subject to section 5404 of this title, there is re-served to

> each State the right to establish standards for the stabilizing and support systems of manufactured homes sited within that State, and for the foundations on which manufactured homes sited within that State are installed, and the right to enforce compliance with such standards, except that such standards shall be consistent with the purposes of this chapter and shall be consistent with the design of the manufacturer.

Id.

The MHA also contains a "savings clause," which states that "[c]ompliance with any Federal manufactured home construction or safety standard ... does not exempt any person from any liability under common law." Id. § 5409(c). Additionally, the MHA contains a provision permitting state law causes of action in state court as long as it is based on an "issue with respect to which no Federal manufactured home construction and safety standard has been established." Id. § 5422(a).

In accordance with the MHA's directive, the HUD has established the Manufactured Home Construction and Safety Standards, 24 C.F.R. §§ 3208, et seq., which govern the standards for formaldehyde emissions from materials used in mobile homes. Under those standards, the formaldehyde emissions levels cannot exceed 0.2 ppm from plywood materials as measured by the air chamber test and cannot exceed 0.3 ppm from particleboard materials as measured by the air chamber test. Id. § 3280.308(a). The regulations also specify that a health notice on formaldehyde emissions shall be temporarily displayed in the kitchen of each manufactured home. Id. § 3280.309.

## 2. Preemption

Preemption ultimately turns on congressional intent. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992). Preemption may be express or implied. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992). First, a state law is preempted if such preemption is explicitly contemplated by the federal statute in question. English v. Gen.

13

Electric Co., 496 U.S. 72, 79 (1990). Second, there are two types of implied preemption: field preemption and conflict preemption. Field preemption exists when a federal law was intended to "occupy the field," that is, if the statute or law regulates an area of policy over which Congress intended the federal government to have exclusive control. Id. Conflict preemption exists when federal law conflicts with a state law such that it is impossible to comply with both at once or such that the state law conflicts with the goals of the federal statute. Id.

### 3. Analysis

The Court will GRANT the Defendants' Motion to Dismiss. This conclusion is mandated by the MHA and its regulations as well as the thorough understanding of that framework discussed in In Re: FEMA Trailer Formaldehyde Prods. Liability Litigation, 620 F. Supp. 2d 755 (E.D. La. 2009). Although FEMA is not controlling authority, the Court adopts its well-reasoned approach to the MHA.

In FEMA, much as in this case, the manufacturers of trailers provided by FEMA to individuals affected by Hurricanes Katrina and Rita moved to dismiss plaintiffs' complaint asserting state law claims for failing to adequately warn about the presence of formaldehyde and for suffering medical injuries following exposure to high levels of formaldehyde contained in the mobile homes. Id. at 756. The plaintiffs' allegations, like Hill's claim, rested on use of an ambient air standard to measure formaldehyde emissions. Id. at 763. The district court in FEMA persuasively concluded that the MHA did not expressly preempt the plaintiffs' claims and also concluded that as to implied preemption, field preemption did not require dismissal of the suit.

The court then turned to an extensive discussion of the branch of implied

preemption known as conflict preemption, which like in FEMA, is dispositive here. As the Supreme Court has stated, conflict preemption exists in two scenarios: (1) when compliance with both a state and federal law is impossible, and/or (2) when the state law conflicts with the federal law such that it stands as an obstacle to the achievement of the federal law's purposes and objectives (also referred to as "obstacle preemption"). See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963). The court in FEMA determined that allowing the plaintiffs' product liability claims which attempted to set standards that would be different from the federal standards would conflict with the MHA and therefore were preempted. FEMA, 620 F. Supp. 2d at 766; see also Macmillan v. Redman Homes, Inc., 818 S.W.2d 87, 89 (Tex. Ct. App. 1991) (same). If plaintiffs' were permitted to assert their state product liability claims raising the ambient air standard, mobile home manufacturers, the court reasoned, "would essentially be required to deviate (in ways variable from state to state) from those federal standards so carefully and thoroughly crafted by HUD." If states want to regulate safety matters already addressed by the MHA, such as formaldehyde emissions, then the court stated those regulations—whether established by statute or common law—must be "identical." Id. (citing 42 U.S.C. § 5403(d)).

Here, like in FEMA, Hill supports his common law negligence claim with standards that are not identical to those "carefully and thoroughly crafted by HUD." See id. To entertain Hill's negligence claim based on alleged physical injuries, the Court would have to accept a formaldehyde emissions standard of .032 ppm, which was obtained using a method specifically rejected by the HUD. These allegations clearly conflict with the federal formaldehyde emissions standards, 24 C.F.R. § 3280.308, that must be evaluated using the

component part testing method, id. §§ 3280.308, 3280.406. Similarly, even if, as Hill asserts, the Defendants failed to comply with the MHA's formaldehyde warning provision, id. § 3280.309, Hill's negligent failure to warn claim must fail because, again, the level of emissions he relies on to show the proximate cause of his alleged injuries conflicts with the formaldehyde emissions levels set by the HUD. As a result, the negligence claim must be dismissed in its entirety.

In an effort to escape preemption, Hill makes a flawed attempt to rely on Harrison v. Skyline Corp., 224 S.E.2d 735 (W. Va. 2009). The court in Harrison "conclude[d] that common law negligence claims based on formaldehyde exposure in manufactured homes which seek to establish a standard of performance not covered by the [MHA] ... or regulations promulgated thereunder and which pose no challenge to the federally established formaldehyde emissions standards, are not subject to preemption." 686 S.E.2d at 745 (emphasis added). The claim in Harrison was not preempted, because the West Virginia Supreme Court determined that the case involved whether the defendant properly disposed of formaldehyde materials, an aspect of performance that both parties in Harrison agreed was not covered by the MHA. As to the use of ambient air testing, the court in Harrison did not permit that type of testing to be used to test the manufacturing of mobile homes, but to establish a standard for proper disposal of formaldehyde treated waste materials. Id. at 744. As a result, Harrison has no impact on the preemption analysis discussed above.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motions.

Let the Clerk send a copy of this Memorandum to all counsel of record. An

appropriate order will issue.

It is SO ORDERED.

/s/
James R. Spencer
Chief United States District Judge

ENTERED this 7th day of July 2010